Good morning, Your Honors. I'm Elizabeth Brancart and I'm here on behalf of the plaintiff appellants and with me at council table is my co-counsel, Steve Pollan, and then Theresa Kwong, who is with the United States Department of Justice, and she'll be taking seven minutes of my time to argue the United States' position as amicus. And I'd like to reserve three minutes of my time for rebuttal. Okay. So, in 2007, the City of Newport Beach set out with a discriminatory objective, and that was to substantially reduce the number of group homes for persons in recovery in the city and to make sure that no other new homes opened. Two years later, the city had substantially succeeded. Over approximately a half of the housing opportunities for people in recovery in the city were either closed or closing, and no new homes had opened. To accomplish this goal, the city enacted a facially neutral ordinance, but it, in fact, had the sole purpose of substantially reducing or group homes and making sure that none opened. And the error in this case was the district court and the city both looked at the case as if this ordinance was not neutral, was neutral, that it had been enacted for a neutral purpose and was neutral on its face, when, in fact, it was, its neutrality was a pretext to hide its intent, its discriminatory purpose and intent. And what I thought I would do is walk through the ordinance and how it applied and how it shows that it was not neutral and was never intended to be neutral. It also will show why the city's claims that we have waived certain claims on appeal is meritless. I don't think you did waive certain claims, but your issue is whether you can use the evidence. We waived, yes, we waived our equitable relief claims under a disparate impact theory as part of, we dismissed that with prejudice to get a final judgment, and we did not raise on appeal as a separate claim whether or not the use permit processes employed by the city themselves were stand-alone violations of the Fair Housing Act and the ADA. But we do challenge the enactment and enforcement of the 2008 ordinance of which those use permit processes were just a constituent part, a manner in which the city was able to accomplish its purpose. So the ordinance that was enacted in 2008 regulates residential care facilities, which the city has defined as groups of disabled persons living together, not as a single housekeeping unit. There is one small aspect that is not included in this case, and that is licensed group homes for six and under, because California state law says they must be treated as a single-family dwelling. So they're not regulated in the same way that the city regulates other group homes for persons in recovery, and indeed this would also apply to anyone with disabilities. It's not, the face of the statute doesn't apply only to people in recovery. So the statute regulates, I'm going to call them group homes, for persons with disabilities, and they, it requires that such homes get a use permit and only be located in a multifamily residential area. And that was what the city did prospectively for future homes. But then for existing homes that were in residential districts at the time of the passage of the statute, it provided for a use permit process, which they had to apply for within 90 days or else be abated. And that use permit process was designed to substantially reduce the number of group homes in the city. As the council member, Hen, who was the, one of the, the head of the committee that liaisoned with council, outside council to draft the ordinance, said it was an act, that the ordinance was designed to substantially reduce the number of group homes in the city. Rectify, to mitigate the over-concentration on the number of group homes that the city had, and was a substantive attack on those, on those group homes, and would substantially mitigate and properly mitigate the number of homes in the, in the city. In acting the ordinance, one of the key points was that the city changed the definition of single housekeeping unit, which before the ordinance, was a single housekeeping unit. The 2008 ordinance had said a single housekeeping unit is the functional equivalent of a family. It's people, unrelated, they live together, they use the house together, they share meals, chores, they have a, an oral, written or oral single lease. They changed, the city changed that definition to include, in addition, that if the property was rented, it had to have a single oral or written single lease. I mean, a single written lease, and that the, the, the makeup of the, of the residence was, was decided by the residence themselves, and not by a property manager or a landlord. And this is significant, because in our case, Yellowstone and Pacific Shores both qualified as, as single housekeeping units, and were therefore permitted as a matter of right in residential zones. Is it your case that what the city looked at how these homes were run, and they reverse engineered the statute to strike at their organizational structure? Is that, is that what the case is? That's not the entire case, but that is a significant aspect of the case, yes. That, how do we know it's not mere coincidence? I think, because if you look at the history of what happened, and how they came to draft the ordinances, that they started out to be broad, to apply to all uses that would have similar, the short term lodgings, the vacation rentals. To what extent does your argument hinge on this discriminatory intent in adopting the ordinance? Well, I think the entire, the case that's out here... It stands and falls on it. Yes, I mean... And you think that's, you're relying on Arlington Heights? Yes. And the United States is going to talk about Arlington Heights more. But yes, that's what we're... Well, it's sort of key to your case, right? Well, yes, it is. You say your case hinges on it. And you think Arlington Heights applies to both your statutory and constitutional claims? Yes. Yes, and it does. And it shows, the analysis of the Arlington Heights factors in this case shows strong evidence of discriminatory intent in the adoption of the 2008 ordinance, and in its subsequent enforcement. So, if you were to win here, you'd get what? You'd get a trial? Yes, we would get a trial. And what would that trial look like? Well, the trial would have... You'd put, Larry, you'd put city council people on the stand and cross-examine them on why they voted for... I mean, I don't even know. Do they have a city council? What do they have in... They do have a city council. No, that won't be necessary because there is enough evidence of statements made on the record by city council persons and persons that were involved in the enforcement of the... You did not cross-move a summary judgment, so this is not a... Correct, because we recognize we couldn't get summary judgment on an intentional discrimination claim. Because? Because I believe... You'd have to have a finding of... Of intent that would always be a question for the finder of fact. It is when you're dealing with people, but you're not really... This is not the kind of intent you're looking for that, you know, what does a human being intend. This is the intent of a body, of a political body, and I... Yes, but that can only be expressed through human beings. Well, it's evidence of it, of course. Yes. Yes. It's sort of a construct. There isn't such thing as collective intent. I'm just wondering why you couldn't... I mean, you didn't, in fact, get... And I'm not sure you're entitled to summary judgment, but I'm not exactly sure why this is not something that could be a summary judgment. You could direct it on remand. I wasn't suggesting that. Oh. I was really just wondering about your position, since you didn't move for summary judgment, and you're telling me this is something that you don't think could be resolved in summary judgment, but it's not at all clear to me that you couldn't be. But anyway, it's not in the case. No, I've never seen a summary judgment brought by the plaintiffs against a city on intentional discrimination, but I will keep looking because I would like to use those... Certainly true if you're dealing with the intent of human beings. If you're dealing with what's going on in the minds of individuals, I think it's very hard. But this is a different kind of intent. If you're dealing with the intent of a legislative body in adopting an ordinance, there's no specific thought that you're targeting what's going on through a human being's mind. It's really something you derive from a set of circumstances. But anyway, it's not in the case. I just wanted to make sure I understood where you stood on this. Yes, you understand. Is that my time left on the 10 minutes? That's your time left. No, that's the total time. That's the whole time? Yes. Oh, yes, yes. I'm going to reserve the rest of my minute and 37 seconds, and then give the rest of the time to the United States. Okay. Thanks. May it please the Court, my name is Teresa Kwong, and I represent the United States. I will address the erroneous legal standard that the district court used in granting summary judgment to the city on the intentional discrimination claim. The Court's decision was based solely on the lack of comparator evidence. Requiring comparator evidence was error. As this Court has stated numerous times, one way a plaintiff may prove intentional discrimination is by providing evidence demonstrating that a discriminatory reason more likely than not motivated the challenge action. This approach, which does not require comparator evidence, is consistent with the Supreme Court's decision in Arlington Heights. Indeed, the city, in its brief on appeal, acknowledges that plaintiffs need not provide comparator evidence to prove intent. The cases cited by the district court in support of requiring comparator evidence are inapposite. The Ninth Circuit cases that the district court relied on involved plaintiffs who relied on the McDonnell-Douglas approach and not Arlington Heights. The out-of-circuit cases that the district court relied on are similarly unavailing. For example, Schwartz involved only a selective enforcement claim. And to the extent that the Eighth Circuit's case in Oxford House v. A.R.C. stated that comparator evidence was needed regardless of what the decision-maker's intent was, that case conflicts with the Ninth Circuit rule in Arlington Heights. The district court also erred in stating that absent comparator evidence, plaintiffs needed to provide evidence showing disparate impact on a protected class. In support, the court relied on Arlington Heights and Pike, but neither of those cases held that. Indeed, the Second Circuit and Pike stated that a plaintiff seeking to establish  That is exactly what the plaintiffs did below. Plaintiffs provided evidence that the sober home residents' disabilities motivated the city's enactment of the 2008 Ordinance, and the enactment of the Ordinance denied or otherwise made unavailable the housing of choice for individuals with disabilities. By enacting the Ordinance, the city intended to make it more difficult for sober homes to operate, and the record shows that the city has succeeded. Indeed, Newport Coast no longer operates a sober home in the city, while the other two plaintiffs operate sober homes at a much smaller capacity than prior to 2008. Plaintiffs are Well, how do we know that's affected the Ordinance? I mean, it could be coincidence. It could be down to an economy. It could be a lot of other stuff. I mean, the very past Ordinance and bad things happen to businesses. But by definition, on the day that the Ordinance was enacted, the plaintiffs and other sober homes were served a notice that they needed to apply for a use permit within 90 days, or they had to shut down. Just by definition, the Ordinance made it more difficult for sober homes to operate in the city, and that's the language of the Fair Housing Act, that the discriminatory act is an act that either could deny or otherwise make unavailable housing based on disability. And that's just what happened when the Ordinance was enacted. So your view is the intent doesn't matter? The intent does matter because this is an intentional discrimination claim. So you need to show under Arlington Heights, you need to show, and plaintiffs did this, they provided evidence that the disabilities of the individuals who live in sober homes motivated the city in enacting the Ordinance, and the act is the enactment of the Ordinance because once the Ordinance was enacted, it denied or otherwise made unavailable this kind of housing, sober homes that the individuals with disabilities wanted. Well, I thought I heard you say two different things. I thought you said it made things more difficult, and that is a violation of right there. And then you said, oh, intent matters. So I'm not... Well, you need to show intent to show an intentional violation of the Fair Housing Act. The intent to what? The intent to treat, to otherwise make housing unavailable based on disabilities. So I see. So your position is that just passing an Ordinance that's facially neutral that has the effect of making things more difficult is not enough. That's correct. You have to actually intend to make things more difficult. You actually intend to discriminate. That is true for an intentional discrimination claim, which is what is at issue here. Well, what if, for example, you have a case that's of intentional discrimination and nothing occurs? In other words, you pass a facially neutral Ordinance with a discriminatory motive that's clear from the face of it, and no discrimination occurs. You don't have an actionable case, do you? Well, it's hard to answer that question when I'm not sure, you know, I don't know what the wording of that Ordinance is. Here, by definition, as Judge Kuczynski stated earlier, that this Ordinance, although it appears facially neutral, it targets how sober homes operate and makes it harder for them to operate by putting conditions on it. Right. I guess I was maybe asking a little more theoretical question, which is how do we analyze this case? I mean, I don't think intentional discrimination alone without a harm can give rise to an action on a facially neutral Ordinance. Would you agree with that? Yes, but here there is harm. I'm not asking here. I'm saying just analytically. So we have to look at, one, is there sufficient evidence of a discriminatory motive to survive summary judgment? And, two, is there sufficient evidence of harm, harm as a result of discrimination to survive? Is that what we're looking at? Well, I'm not even sure you need to answer those questions, because the only question here is not whether this evidence shows sufficient intent to prove an amplified summary judgment. No, I'm talking about sufficient evidence to survive summary judgment. Well, I think here you do have ample evidence. I'm not quarreling with you. I'm just talking about the analysis. The analysis, I think, may touch upon two separate points, because you're talking about what is the harm that is the violation of the statute, let's say the Fair Housing Act, and then what kind of injury does it, you know, let's say you have an Ordinance that was enacted and the city hasn't enforced it. Can someone bring a claim against that Ordinance? And I think you also would have to answer standing questions, but they're different questions. One is what does the statute prohibit? And two, does this plaintiff have standing? You're eating into your co-counsel's time. I'm sorry. I'm sorry. Thank you. We'll hear from the city. Good afternoon. Peter Pierce, appearing on behalf of the City of Newport Beach. May it please the Court. Discriminatory intent is but one part of the discriminatory treatment analysis. As Judge Thomas alluded to, the second part is an adverse effect or harm. And in this particular case, on the record before this Court, none of the plaintiffs suffered an adverse effect which would be redressable in the district court. And I'm going to take the plaintiffs one at a time, if I might. Pacific Shores applied for a reasonable accommodation for 18 persons in each of its facilities. And the hearing officer denied that request, and Pacific Shores appealed that decision to the city council. Before the city council could hear the appeal, Pacific Shores revised its request and asked for 12 residents in each building. How many people did they have before the ordinance? Your Honor, the request was for 18 in each. No, that's not what I asked you. Yes, Your Honor. How many people did they have in their facility before the ordinance? The evidence shows there was 14 in one, I believe, Your Honor, and 19 in another. Those are the two facilities on Orange Avenue. And Pacific Shores revised its request for a reasonable accommodation to seek 12 residents in each building. Okay. Has anyone asked why they revised it? Your Honor, Pacific Shores' position they revised it because they assumed the city council was going to uphold the hearing officer's denial of 18. I point out, however, that in their revised request for 12, they did not submit that request under protest. They did not proceed on a parallel track asking the city council to overturn the denial of 18 but in the alternative allow 12. They just revised it to 12, and in their four-page letter, which is at 59-57 of the record, they expressly stated that 12 is what they needed to maintain economic viability and to provide persons in recovery an equal opportunity to enjoy a dwelling of their choice. The city council granted the request for a reasonable accommodation, and Pacific Shores has been operating pursuant to that request ever since it was granted. In fact, Pacific Shores has been operating since a few years before the ordinance was even adopted. So as far as Pacific Shores is concerned, there has been no adverse effect on it from the application of the ordinance, and therefore, summary judgment as to Pacific Shores should be affirmed on its discriminatory treatment claim. I understand. I thought I heard you say that they had 19 in one and 14 in the other. At some point, yes, Your Honor, in 2007, the record reflected that that was the level of residence at that time, yes. That's a long way of saying yes. Only a lawyer could do that. I haven't even gotten to my question, but, you know, yes. I'm sorry, Your Honor. Yes? Yes. Okay. So why isn't the fact that they are now limited to 12 from 19 or 14 itself enough to show harm? Because, Your Honor, they revised that request themselves without prompting by the city. The Pacific Shores submitted a revised reasonable comment. You know, you say that. You said that in your briefing. You repeated it again today, but I don't understand why that's an answer to my question. I mean, obviously they didn't revise it because they wanted fewer people there. They revised it to deal with this ordinance. So if the ordinance goes away, they don't have to revise, and they're back to 14 and 19. So I don't understand what this protest or not protest or submitting or not submitting, what does that have anything to do with whether or not they were harmed by this? Your Honor, our point is that if they had wanted to challenge the denial of 18, they could have done that, and they didn't do it. I understand, and that's true, but I don't understand why it matters. The point, you know, your point is they weren't harmed. I see two different sets of numbers. One of them is just bigger than the other ones, and I'm saying why isn't that the harm? Unless you have some sort of waiver argument, what does any of the other stuff you're talking about have anything to do with whether they were harmed? The answer, Your Honor, is it was within their control as to how many people they wanted to have in the house and the level of individuals from which they wanted to seek approval, and they decided to seek approval for 12. Okay. I understand, but what does that have to do with whether they were harmed? They submit to 12 because they've got this thing to deal with, which is harming them, but I don't see how that's an argument about whether they were harmed or not harmed. Obviously, if the ordinance weren't there, they wouldn't have had to submit 12 or make an application or do any of that stuff. I just am not understanding your argument. Well, let me try again, Your Honor. Okay. This court in the Griswold case, which is cited in our brief, has stated that if a party attains a permit and enjoys the benefits of that permit, it has not been allowed to come to court and challenge the terms of the permit, and we submit that that is exactly what Pacific Shores is doing here. In fact, the Griswold case, Your Honor, cites California cases, some California cases that begin a line of California cases that state, unless the terms of a permit are challenged by way of a mandate action in state court, that the administrative decision with respect to that permit achieves finality, is it entitled to preclusive effect. And so our position today is that by failing to challenge the hearing officer's denial of their original request for 18 and by submitting a revised request for 12. Well, I'm sorry. This is the unpublished case of Griswold v. City of Carlsbad? Yes, Your Honor. It's a 2010 case. Why don't you give me something that's citable, something that's authority? Well, Your Honor, that's citable under the national rules. Well, you can cite it, but I don't read it. It's unpublished disposition. I was asking for authority. I wasn't asking for mere filler. Well, it's authority in California law as well, Your Honor, in the case MOLA against the City of Seal Beach. It stands for the proposition that I just announced, that unless the conditions of the permit are challenged in mandate. Well, let me ask you this. Since Griswold is not a binding authority of this Court, and I think it's wrong, how are you going to keep me from writing an opinion saying the opposite? Tell me. Persuade me. Yes, Your Honor. Go for it. Yes, Your Honor. The plaintiffs are charged with producing evidence to this Court that would show with a reasonable certainty that the City's action, an action of the City has caused their damages. And what Pacific Shores and the other plaintiffs have said here is, in the wake of this ordinance, they have sustained damages because less individuals are living in their residences that lived in the residence before. Right. Well, our position, Your Honor, is that the district court correctly found the plaintiffs did not identify any residents who prematurely departed because of any action the City took or any would-be residents. But this is an ordinance there that says you can't take on more people. You're limited to 12 or, you know, whatever the limit is or whatever they ask for. Then it's hard to identify individuals. People leave. You can't bring anybody else in because you're limited to 12. Let me put it in somewhat simpler terms. Look, something happens locally. They have this ordinance. They said, look, we're going to do our best to try to deal with it. We don't want to make a federal case out of it, maybe. Let's see if we can. I didn't mean it. It's funny. So let's try to deal with it locally. We'll try to get a permit and so on. And, you know, try to see if we can make do with that. How does that in any way impact or waive your federal rights if, in fact, it turns out after you do all of those things, you suffer damage? Just because you went and tried to sort of accommodate. Why should it? Well, the City here, Your Honor, didn't have the opportunity. The City Council didn't have the opportunity after the hearing officer denied the request for 18 residents to decide whether or not that decision was correct. But what's challenging is the very process of saying you shouldn't have passed this law to begin with. So you had every chance not to pass the law. You did pass the law. We suffered harm. And, you know, maybe you could have cut us a better deal and maybe we could have lived under the coordinates if you had just let us have 18. You know, maybe then we wouldn't have gone to federal court. But you didn't, and now we suffered damage. Now we're in federal court. Let's talk about why you don't lose. I mean, I... Your Honor, there was no evidence adduced by the plaintiffs below that anything the City did, any action the City took caused them to suffer the decrease in residents that they complained about. How about adoption of the ordinance, which limited them to the number of, you know... How about the mere adoption of the ordinance, which I think is what they're arguing? Well, Your Honor, the adoption of the ordinance, the ordinance doesn't include the number 12 in it. I mean, the ordinance doesn't say you're limited to 12. The plaintiffs applied for a reasonable accommodation for 18. The hearing officer, based on the facts before the hearing officer, denied that. The plaintiffs had an opportunity to appeal that to the City Council, which they did. The point I'm trying to make, Chief Judge Kaczynski, is prior to the time the City Council heard that appeal, the plaintiffs revised their request to 12, and the City granted that request. The City didn't say, you have to revise your request to 12. The City didn't say, we're not going to hear your appeal from 18. But the City granted that request, and Pacific Shores has enjoyed the benefits of that grant ever since. And under those circumstances, since they didn't challenge the 18, since they didn't file the revised request under protest, since the City granted that request, it's the City's position that Pacific Shores hasn't been harmed by virtue of anything the City made it do. Okay. I think we understand your argument in this regard. Let's see you lose on that. Is that the end of the matter? Do you have any other arguments? Well, yes, Your Honor. I'm not saying you will. I'm just saying, I do understand. I don't think there's anything that you're going to be able to tell us on that point. So unless you want to sit down, why don't you go to your backup arguments? Well, I would like to address the single housekeeping unit definition, because it is one of the centerpieces of this case, Your Honor. The single housekeeping unit definition was adopted by way of the ordinance. And the plaintiffs have said it is impossible for them to comply with the single housekeeping unit definition, but the evidence they submitted to the district court undermines that conclusion. There was a declaration in the record submitted by Paul Malloy. It's summarized in the opposing separate statement at 2001 to 2003, which says that if these residences had organized similar to the way an Oxford house is organized, that that would have satisfied the definition of single housekeeping unit. In fact, both Yellowstone and Pacific Shores have claimed throughout this litigation that they operate pursuant to the Oxford house model and, therefore, satisfy the definition of single housekeeping unit. But it's not a disputed issue of fact. I mean, we're dealing with summary judgment here, so we have to draw inferences in their favor. Why is that dispositive, then? Well, the district court, Your Honor, found, in fact, that at the time the evidence was submitted, that neither Pacific Shores nor Yellowstone operated as single housekeeping units, and neither one of them have challenged that finding before this court. Well, it's not a finding, though. You know, you don't find facts on summary judgment. You take undisputed facts and apply the law to it. That's why I was going to ask you about this, because I was a little perplexed by your brief, where you say they've conceded this finding, because the district court didn't make a finding after hearing all the evidence. It just said it just applied the law to what it thought were the undisputed facts. If they create a genuine material issue of fact, dispute about it, then it goes past summary judgment. Well, yes, Your Honor. The district court found there was no disputed issue of material fact with respect to whether or not they satisfy the criteria of single housekeeping unit because they didn't satisfy the single written lease requirement, and they didn't satisfy the requirement that all of the residents of the household determine the makeup of the household. Returning to the— Well, I was asking about the affidavit, because the affidavit proved X, and I said, well, that's why I was asking the question to begin with. Well, yes, Your Honor. The affidavits that were submitted by the plaintiff below didn't satisfy their burden, the district court concluded, and it's because the totality of the evidence submitted by the plaintiffs below didn't show that they operated pursuant to a single lease or that the individuals who live in the household determined the makeup of the household. In fact, the testimony of the plaintiffs that was submitted to the district court, the district court found showed otherwise, and the district court concluded from that testimony and the evidence submitted by the city that there was no disputed issue of material fact. With respect to the selective enforcement component of the discriminatory treatment claim, the district court correctly decided that the use permit requirement actually works to the benefit of the residential care facilities because the residential care facilities in the city are the only type of use, if they're not a single housekeeping unit, that are eligible to apply for a use permit to remain in the single family residential zone. All other non-single housekeeping type of residential uses, if they do not have disabled persons living within the residence, are not entitled to live in a residential zone. Returning to the issue of damages for a moment, if I may, the plaintiffs also contend that they are entitled to damages for loss of income and because of loss of business opportunity. And again, the district court was correct in finding that the plaintiffs, unlike the landlord in the Lozano case in the Third Circuit upon which the plaintiffs rely, did not marshal evidence showing that any particular individual prematurely departed a facility or failed to enroll as a resident in a facility because of anything the city did. The plaintiffs below submitted evidence to show that they have a screening process to enter their facilities and yet they did not produce any evidence to show that individuals had been pre-screened and were ready to move in and because of something the city did, those individuals decided not to move in. The thrust of the plaintiff's evidence below was there was a lot of publicity surrounding the city's adoption of this ordinance and in response to that publicity, there was a decrease in the number of residents in their facility. And I would submit to this court that there is a difference between publicity causing something and an action of the city causing something. And to the extent plaintiffs seek damages in terms of the attorney's fees that were incurred by them to go through the reasonable accommodation and use permit process and also to the extent they seek damages in terms of the staff hours that were spent on that, the district court found that the reasonable accommodation and use permit process was valid and the plaintiffs have not contested that in this court. Also, to the extent the city denied Yellowstone's reasonable accommodation and excuse me, use permit applications, Yellowstone dismissed its claims challenging the city's denial of those applications insofar as they sought equitable relief. And Yellowstone could have attempted to continue prosecuting those claims in the district court and seek attorney's fees separately as the district court acknowledged, but they did not. They didn't have to do that. If they only want to challenge the ordinance and they say that these are costs and damages that they incurred as a result of the ordinance, it may be true that they could have challenged something else as well, but that doesn't make it any less a product of the ordinance. Without the ordinance, they wouldn't have had to have these expenses. That is true, Your Honor. I think the point, the larger point the district court was making is those damages, so to speak, in the form of attorney's fees spent on complying with the discretionary approval process were more appropriately sought in a motion for attorney's fees. And if this court decides to make Well, it's not just attorney's fees. It's a tremendous amount of staff time with this long, complicated application. Yes, Your Honor, that is true. I will point out that there is no evidence in the record, however, that if that staff time had been spent on something other than complying with the city's discretionary approval process, that that itself would have generated some sort of income that the plaintiffs lost because they had to spend the time on the city's discretionary approval process. So at the end of the day, if this court does decide to reverse this case and send it back for trial, I would just point out there are two ways the court can pare down the issues for remand. One is with respect to Pacific Shores. For the reasons I've stated earlier, Pacific Shores has realized the benefit of the permit it sought on terms that it sought, and the district court was correct in granting summary judgment as to the city as against Pacific Shores on the discriminatory treatment claim. And finally, the plaintiffs have not met their burden of showing with a reasonable certainty that the city did anything to cause the damages they were alleged to have sustained. I see that my time has elapsed unless the court has any questions the city submits. Okay. Thank you. Thank you. We've got about a minute left. I just want to direct the court's attention to our reply brief, and in that brief there's a discussion about what the city was just saying about Pacific Shores waiving its rights to that it had no injury because it submitted a reasonable accommodation request that reduced the number to 12, as well as a discussion of the damages issue. But I wanted to address Judge Thomas's question, his hypothetical question about whether just the passage of an ordinance with a discriminatory intent would violate the law. And our position is no. Just the passage. There does have to be something else. You have to show damage. Yes. So what's your damage theory as to Pacific Shores? To Pacific Shores is that they had the ordinance applied to them. And they were required to make a reasonable accommodation request or else shut their doors. They incurred the expenses of staff time and attorneys to make those requests. During the process, they had already filed their Federal lawsuit challenging the ordinance by this time. But during the process, they amended their request to have a reduced number of residents because the hearing officer had said, well, maybe he might grant that. That was while it was on appeal to the city council. And so they amended their request. They went back. Right. But if your theory is that we wanted 18 or whatever and you only got 12, is that your theory along with the expense? As to the damage? I'm sorry. You asked for 18 and you reduced it to 12 voluntarily. Yes. How can you get damages for that? Because the entire process was brought about because of the discriminatory ordinance. No, I understand that part of your theory. But without the ordinance, they wouldn't have been there at all. No, but I mean, when you get that far, then you voluntarily reduce it from 18 to 12. If we were challenging that process and that was the only thing that was involved in the case, that we were saying that the process of the reasonable accommodation standing alone violated the law, I think that would be true. But we're saying that the entire ordinance under which the reasonable accommodation was just a part violated the law. Thank you. Okay, thank you. Cases are, you've been submitted. We're adjourned.
judges: Kozinski, Reinhardt, Thomas